# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ACKERMANN | § | |
| | § | |
| V. | § | CASE NO. 4:05CV84 |
| | § | (Judge Schneider/Judge Bush) |
| WYETH PHARMACEUTICALS | § | |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant's Motion for Partial Summary (Docket # 77). Having considered the motion, Plaintiff's response, and Defendant's reply, the Court finds as follows.

### STANDARD

A party is entitled to summary judgment on all or any part of a claim "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party must show initially that there is no genuine issue of any material fact. *Id.* at 256. The movant may meet this burden by pointing out the absence of evidence supporting any essential element of the non-moving party's claim. *Celotex Corp. V. Catrett*, 477 U.S. 317 (1986).

In deciding whether to grant a motion for summary judgment, the Court "review[s] the evidence and inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991) (*citing Duvall v. The Ritz Carlton Hotel Co.*, 946 F.2d 418, 420 (5th Cir. 1991), *and quoting* Fed. R. Civ. P. 56(c)). An issue

1

is "genuine" only if the evidence could lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992) (*citing Anderson*, 477 U.S. at 255).

The opposing party may not rest on the mere allegations or denials of artful pleading, but must set forth affirmative facts that show a genuine issue for trial. *Anderson*, 477 U.S. at 256. This requires that the non-moving party make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden at trial. *Nowlin v. R.T.C.*, 33 F.3d 498, 501 (5th Cir. 1994) (*citing Celotex*, 477 U.S. at 322-23). At issue is whether the FDA's regulation preempts state law on failure to warn claims.

## History

Plaintiff, Rozlyn Ackermann, individually and as personal representative of the Estate of Martin Ackermann, sued Wyeth Pharmaceuticals ("Wyeth") for the death of her husband, Martin. According to the complaint, Martin died of a self-inflicted gunshot wound on January 17, 2002, while taking the prescription drug Effexor, which was manufactured by Wyeth. Plaintiff maintains that the principal mode of action for Effexor is inhibition of the re-uptake of serotonin. Plaintiff contends that Martin was in the "small vulnerable sub population" of patients who are at an increased risk of violence and suicide as a result of taking Effexor and other Selective Serotonin Re-uptake Inhibitors ("SSRI"). One of the theories of recovery pled is negligence based on Wyeth's failure to warn of the increased risk of suicide in some patients while taking this drug. Wyeth has filed a Motion for Partial Summary Judgment contending that this theory of recovery is preempted by regulations promulgated by the Food and Drug Administration ("FDA").

The parties are essentially in agreement as to the approval process for a drug, as well as to the general principles governing preemption. A recent opinion by our late Senior Judge Steger

highlights the approval process and the rules governing preemption. *Cartwright v. Pfizer, Inc.,* 369 F. Supp. 2d 876 (E.D. Tex. 2005).

The federal Food, Drug, and Cosmetic Act ("FDCA") requires FDA approval of prescription medicines as "safe and effective" before they may be sold in this country. Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 355(d), 393(b)(2)(B) (2003). To obtain approval, a manufacturer must submit a New Drug Application ("NDA") containing test results, results of clinical studies, and other information. *Id.* at § 355(b), (d). The FDCA requires the FDA to disapprove an NDA if the agency finds that:

> (1) the investigations, reports of which are required to be submitted to the Secretary..., do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions,...(4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; or (5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof...or (7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular[.]

*Id.,* § 355(d).

After approving an NDA, the FDA continues to monitor the drug's safety. The agency must withdraw its prior approval if at any time it finds that "clinical or other experience, tests, or other scientific data show that such drug is unsafe for use" or, "on the basis of new information," that the labeling is "false or misleading in any particular. *Id.*, § 355(e). An element the FDA considers crucial in determining whether a drug is safe is the labeling used to inform physicians about the

drug's uses and risks. New Drug and Antibiotic Regulations, 50 Fed. Reg. 7452-01, 7470 (Feb. 22, 1985) ("Drug labeling serves as the standard under which the FDA determines whether a product is safe and effective."). The FDA regulates all such labeling, including "all written, printed, or graphic matter" used in marketing the drug. Food and Drugs, 21 C.F.R. § 1.3(a) (2006).

The FDA approves the NDA only if the agency "determines that the drug meets the statutory standards for safety...and labeling." *See id.* § 314.105(c). The FDA refuses approval if test results "show that the drug is unsafe for use under the conditions prescribed, recommended, or suggested in its proposed labeling or the results do not show the drug product is safe for use under those conditions," or if "[t]here is insufficient information about the drug to determine whether the product is safe for use under the conditions prescribed, recommended or suggested in its proposed labeling." *See id.* §§ 314.125(a), (b)(3)-(4).

FDA regulations mandate the format and content of all the labeling sections, "Contraindications," "Warnings," "Precautions," and "Adverse Reactions," and the risk information each section must contain. *See id.* §§ 201.56-57. The FDA states its product-specific labeling requirements in an "approvable" letter to the manufacturer. *See id.* § 314.110(a) ("FDA will send the applicant an approvable letter if the application...substantially meets the requirements of this part and the agency believes that it can approve the application... if...specific conditions (for example, certain changes in labeling) are agreed to by the applicant. The approvable letter will describe...the conditions the applicant is asked to meet."). Approval of the NDA is "conditioned upon the applicant incorporating the specified labeling changes exactly as directed, and upon the applicant submitting to the FDA a copy of the final printed labeling prior to marketing." *See id.* § 314.105(b).

Wyeth's summary judgment evidence shows that it submitted its NDA on April 25, 1991,

for Effexor (venlafaxine hydrochloride tablets) to treat depression. The 482-volume NDA, which contained suicidality data, was organized into sections containing the Index; Summary; Chemistry; Manufacturing and Controls; Methods Validation Package; Draft Labeling; Nonclinical Pharmacology and Toxicology; Human Pharmacokinetics and Bioavailability; Clinical [information]; Statistical [information]; Case Report Tabulations; Case Report Forms; and Patent Information. (Def.'s Mot. for Partial Summ. J., App. 5 at 2; App. 6A at 92; App. 6B at 337-45). On April 30, 1993, the Psychopharmacologic Drugs Advisory Committee ("PDAC") experts convened to give the FDA the independent judgment of the committee regarding the safety and effectiveness of Effexor (immediate release). (*Id.* at App. 7 at 1, 11:3-4, 11:13-15). At that meeting, Dr. James Knudsen of the FDA, stated that the agency employed several strategies to explore the possibility of a relationship between venlafaxine and suicidaility, and none of the analyses revealed a greater risk of suicidality for venlafaxine. *(Id*. at App. 7, 37:9, 51:13-15, 51:18-19). Dr. Knudsen was the same FDA official who, in a 1990 PDAC meeting, had addressed suicidality issues with respect to Zoloft. (*Id*. at n. 3) (*citing Motus v. Pfizer Inc.*, Nos. 02-55372 & 02-55498, Amicus Br. for the United States at 7, 13 (9th Cir. Sept. 4, 2002)). The 1993 PDAC voted 8-0 (with one abstention) that Effexor (immediate release) was effective to treat depression, and 7-0 (with two abstentions) that it was safe to treat depression. (Def.'s Mot. for Partial Summ. J. at App. 7 at 181:11-20, 190:1-9, 202:15-16).

On May 23, 1991, representatives of the "Public Citizen Health Research Group" filed a "citizen petition" asking the FDA to revise the Prozac label to include a warning regarding its association with intense, violent suicidal preoccupation, agitation, and impulsivity in a small minority of patients." (*Id.* at App. 8 at 1, 2). On September 20, 1991, the FDA again convened its

PDAC to further its "scientific investigation into suicidal ideation, suicidal acts, and other violent behavior reported to occur in association with the pharmacological treatment of depression." (*Id.* at App. 9 at 1, 9:24-10:3). The PDAC considered "the possibility of a causal linkage between the emergence and/or intensification of suicidal thoughts and acts, suicidality, that is, and/or other violent behaviors and the use of antidepressant drugs." (*Id.* at App. 9 at 1, 122:22-25).

An attorney for certain plaintiffs testified that "[w]hile Prozac may be safe for many, we say that as to a small percentage, Prozac is responsible for suicidal ideation, actual suicide, violent behavior, and, in some cases, even homicide." (*Id.* at App. 9 at 42:24, 43:2-3, 43:7-10). Dr. Paul Leber, Director of the FDA's Division of Neuropharmacological Drug Products, stated that "any consideration of the need for additional regulatory action must begin with appreciation of the fact that suicidal thoughts, acts, and other violent behaviors are common manifestations of psychiatric syndromes for which antidepressants are prescribed..." (*Id.* at App. 9 at 123:4-5, 124:19-125:6). Dr. Leber further stated: "[A]ssessments of the potential of drugs to cause harm are ordinarily only deemed reliable in the scientific community if they are derived from clinical sources of evidence that allow a comparison, and it is a comparison of the incidence and intensity of the events emerging in both the presence and the absence of drug treatment [and] an evaluation of such sources, at least to date, evaluation by FDA scientists, outside consultants, and by our physicians, have not led us to conclude that there is a differential rate of risk for Prozac related to suicidal thoughts, acts, or other violent behaviors." (*Id.* at App. 9 at 125:20-126:7). With respect to the issue of modifying the labeling of antidepressants, Dr. Leber wanted "to emphasize–I do not think it affects just [Prozac], but affects all antidepressant drugs in general, and maybe the next new drug that comes along." (*Id. a*t App. 9 at 131:7).

Article VI, clause 2 of the United States Constitution, preempts any state law that conflicts with the exercise of federal power. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982). "Federal law will override state law under the Supremacy Clause when (1) Congress expressly preempts state law; (2) Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes." *English v. Gen Elec. Co.*, 496 U.S. 72, 78-79 (1990). "[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Frank v. Delta Airlines, Inc.*, 314 F.3d 195, 197 (5th Cir. 2002) (*quoting Medtronic, Inc. V. Lohr*, 518 U.S. 470, 485 (1996)). Wyeth argues that only conflict preemption is at issue in the case *sub judice.*

Wyeth cites the court to two cases , *Needleman v. Pfizer Inc.*, 2004 WL 1773697, (N.D. Tex. Aug. 6, 2004) and *Dusek v. Pfizer Inc.*, 2004 WL 2191804 (S.D. Tex. Feb. 20, 2004), supporting its position that an FDA's regulation of pharmaceuticals preempts a state law failure to warn claim. Wyeth states that both courts relied on essentially the same evidence: the exhaustive new drug application process, an amicus brief filed by the United States stating the government's position on antidepressant warnings, and the fact that the FDA reviewed and rejected three citizen petitions challenging antidepressant drug safety. Wyeth argues that any warning as advocated by Plaintiff would frustrate the government's goal of ensuring the optimal use of drugs by requiring scientifically substantiated warnings.

Wyeth has also submitted supplemental evidence in support of its position. First, it cites the now final FDA rule: Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products (Part II), 71 Fed. Reg. 3,922 (Jan. 24, 2006). Wyeth points out that the FDA states that "under existing preemption principles, FDA approval of labeling under the act... preempts

7

conflicting or contrary State law." Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products (Part II) 71 Fed. Reg. at 3,934. The new rule also notes the FDA's position that any rule to the contrary would disrupt the federal system for drug regulation. *Id.* at 3,969. Wyeth has also provided recent decisions, as well as briefs submitted by the FDA, which clearly demonstrate that at least the FDA views its labeling requirements as preemptive to any other state rule or regulation.

Both parties point to a number of cases supporting their respective positions. In *Cartwright*, Judge Steger noted the very close question, as well as a difficult one, regarding conflict preemption. In finding no preemption, he observed that the FDA's regulations merely set minimum standards thereby allowing a manufacturer to add to or strengthen its warnings. In the rule cited above, the FDA has taken strong exception to many courts' comments noting that the regulations are merely minimum standards. *Cartwright* also noted that numerous courts have found no preemption because of the perception that FDA standards are merely minimum standards. Plaintiff cites the Court to numerous cases which agree with the result reached in *Cartwright*. (Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. n. 9). Wyeth also cites a recent decision, *Colacicco v. Apotex, Inc. et al.*, 2006 US Dist. LEXIS 34127 (E.D. Pa. May 26, 2006) in support of its position.

*Cartwright* also noted that FDA regulations require a manufacturer to issue a warning whenever there is "reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.57(e). The Court also noted that there is a strong presumption against implied conflict preemption in matters dealing with the FDA given the FDA's ability to promulgate regulations which can have a preemptive effect. *Gould v. Ruefenacht*, 471 US 701, 707 (1985). *Cartwright* also cited a Fifth Circuit decision, *Osbourn v. Anchor Labs.*

8

*Inc.*, 825 F.2d 908 (5th Cir. 1987). *Osburn* involved the use of a veterinary drug which allegedly caused leukemia in humans in the manner in which the drug was administered to livestock. The manufacturer argued that a direct conflict existed between the FDA regulations as to the FDA's drug labeling and the state tort claim. The Court rejected the manufacturer's argument for preemption noting that the regulations specifically permitted the manufacturer to add additional warnings to a previously approved label as soon as it became aware of the necessity to do so.

Several Fifth Circuit decisions have held that, as to medical devices, state law claims for failure to warn are preempted as a result of the FDA's rigorous pre-market approval process. *Martin v. Medtronic, Inc.*, 254 F.3d 573 (5th Cir. 2001); *Stamps v. Collagen Corp.*, 984 F.2d 1416 (5th Cir. 1993); *Gomez v. St. Jude Medical Daig Div. Inc.*, 442 F.3d 919 (5th Cir 2006). The Fifth Circuit has also repeatedly held, in respect to Texas law, that as long as a physician-patient relationship exists, the learned intermediary doctrine applies. *Hurley v. Lederle Labs.*, 863 F.2d 1173, 1178 (5th Cir. 1988); *Swayze v. McNeil Labs.*, 807 F.2d 464 (5th Cir. 1987). Therefore, the failure to warn Ackermann of "increased risks" is of no consequence. The ultimate resolution of the claim rests with whether the physician was adequately informed of the "increased risks." The Fifth Circuit has considered cases involving failure to warn. In those cases, preemption does not appear to have been addressed. *See Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254 (5th Cir. 2002).

No party cites to a case from the Fifth Circuit precisely on the preemption issue before the Court. However, a number of district courts, in addition to the *Cartwright* decision in this district, have very recently ruled that state court tort claims for failure to warn in drug cases are not pre-empted. *See Laisure-Radke v. Par Pharm., Inc.,* 426 F. Supp. 2d 1163, 1169 (W.D. Wash. 2006) (plaintiff could bring state law claim for failure to warn of increased risk of suicidality of

9

antidepressant drug fluoxetine as state law not preempted, statement would not be false and misleading, and no frustration of Congressional purpose existed); *Peters v. Astrazeneca, LP.*, 417 F. Supp. 2d 1051, 1055 (W.D. Wis. 2006) (no preemption over state law where FDA did not require a warning on the product); *McNellis v. Pfizer*, 2005 WL 3752269 (D.N.J. December 29, 2005) (common law failure to warn claim not preempted by federal law in Zoloft suicide case, and product not considered mislabeled because the label is strengthened, but burden on plaintiff to prove defendant's knowledge of suicide); *Zikis v. Pfizer, Inc.*, 2005 WL 1126909 (N.D. Ill. May 9, 2005) (finding state court claims not preempted, and manufacturer can add additional warnings and that manufacturer can comply with both FDA and state requirements); *Witczak v. Pfizer, Inc.*, 377 F. Supp. 2d 726, 728-30 (D. Minn. 2005) (manufacturer can unilaterally strengthen a warning; requirement by FDA to use label verbatim did not preempt state law failure to warn claim; and prohibition against false and misleading labels did not preempt failure to warn claims); *See also, Madden v. Wyeth*, 2005 WL 2278081 (Sept. 14, 2005 N.D. Tex.).

 Most of the cases noted above have found no preemption on the basis that the FDA only establishes minimum levels for required warnings. Defendant cites to many briefs filed in recent cases where the FDA directly counters this line of reasoning. Plaintiff does not challenge the veracity of these assertions. Of note is the FDA's view that a claim is preempted if the FDA determined that the warning at issue is not supported by the evidence before the FDA. *See* Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products (Part II), 71 Fed. Reg. at 3935. Its preemption position is premised on the FDA's assertion that "the determination whether labeling revisions are necessary is , in the end, squarely and solely the FDA's under the Act." *Id.* at 3934. In the preamble to a Final Rule regarding "Requirements on

Content and Format of Labeling for Human Prescription Drug and Biological Products," the FDA states that it "believes that State laws conflict with and stand as an obstacle to achievement of the full objectives and purposes of Federal law when they purport to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated." *Id.* at 3935.

As Judge Steger stated, the issue is a close question. Judge Steger did not have the benefit of the FDA's current position on this matter. Nor were the affirmative statements by the Agency on its preemption position available for the Court's consideration. The Court finds that absent some evidence that a drug manufacturer has misled the FDA or failed to disclose critical information, preemption should apply in a failure to warn case. Allowing each state to require different standards for drug labeling promotes confusion not only for the manufacturers but also the consumers. To usurp the FDA's regulation in this area offers the potential for far more harm than benefit to patients. A manufacturer would find itself in a position where every known or possible consequence of ingesting its product would have to be disclosed even in the light of a paucity of valid scientific testing to support the disclosure. Patients would possibly be denied the benefits of a useful drug because of contraindications that were speculative or remote. In the end analysis, uniformity as to warnings promotes confidence in the safety and efficacy of drugs for which Congress has mandated that the FDA is to have exclusive jurisdiction.

## RECOMMENDATION

Based upon the foregoing, the Court recommends that Defendant's Motion for Partial Summary Judgment be GRANTED.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 8th day of September, 2006.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE